## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JULIE C. RIGGS, Pro Se | ) | **CIVIL COMPLAINT** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **CASE NO:** 3:08-cv-247 |
| | ) | |
| MYSPACE, INC.; | ) | |
| NEWS CORPORATION; and | ) | |
| TOM ANDERSON | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### PLAINTIFF'S ORIGINAL PETITION

Plaintiff seeks damages against Defendants for two counts of negligence, gross negligence, breach of contract, fraud, breach of implied contract, fraud by non-disclosure and intentional infliction of emotional distress. Defendants MySpace Incorporated and News Corporation are jointly liable for all claims. Plaintiff also seeks damages against Defendant Tom Anderson for claims of fraud, fraud by non-disclosure and intentional infliction of emotional distress. Plaintiff respectfully shows the court as follows:

### I.

### PARTIES

1.      Plaintiff, Julie C. Riggs, is a Pennsylvania resident, residing in Somerset County, Pennsylvania. Plaintiff resides at – 1208 Bicycle Road, Stoystown, PA 15563. Plaintiff's phone

number is: (814) 341-6998.

2.      Defendant, MySpace Incorporated ("MySpace"), is a Delaware Corporation and a wholly-owned subsidiary of Defendant News Corporation.  MySpace's operating headquarters are located in Los Angeles, California.  MySpace may be served with process at – 8391 Beverly Boulevard, Suite 349, Los Angeles, CA 90048.  MySpace's phone number is: (310) 917-4949.

3.      Defendant, News Corporation ("News Corp") is a Delaware Corporation having its principal headquarters located in New York, New York.  News Corp may be served with process at – 1211 Avenue of the Americas, New York, New York, 10036.  News Corp's phone number is: (212) 852-7000.

4.      Defendant, Tom Anderson ("Mr. Anderson"), is the President of MySpace. Mr. Anderson is well known throughout the online MySpace community and outside of MySpace.  Mr. Anderson automatically becomes a person's first MySpace friend when a new account is registered.  Mr. Anderson works at MySpace's primary headquarters located in Santa Monica, California.  He may be served with process at - 1223 Wilshire Blvd, Ste. 402, Santa Monica, California 90403-5400.  Mr. Anderson can be contacted through MySpace's phone number at: (310) 969-7400.

## II.

## JURISDICTION AND VENUE

5.      This court has jurisdiction pursuant to 28 U.S.C. § 1332 (a) (1).  Plaintiff seeks damages in excess of $75,000, exclusive of interest and costs, and the parties are citizens of different states.  Jurisdiction over this case is also proper as all parties reside in Pennsylvania and/or, conduct substantial, continuous and systematic business in Pennsylvania.

6.      Furthermore, jurisdiction is proper in Pennsylvania under the Pennsylvania Long-Arm

Statute, 42 Pa. C.S.A. § 5322 et seq., because Defendants MySpace, News Corp and Mr. Anderson have committed tortious acts in Pennsylvania and acts that constitute doing business in Pennsylvania.

7.      Venue is proper in Somerset County, Pennsylvania as all or a substantial part of the acts or omissions giving rise to Plaintiffs' claims occurred in Somerset County, Pennsylvania.  Venue is further proper because this court has personal jurisdiction over Defendants.  Defendants have committed tortious acts in Pennsylvania, and/or Defendants have committed acts that constitute doing business in Pennsylvania.

## III.

## FACTS

### Overview of MySpace

8.      MySpace is a social networking site that solicits business from citizens in all fifty states of America and countries around the world.  New business is solicited by encouraging people to sign up and socialize with other MySpace members by creating a profile at www.myspace.com.

9.      MySpace was founded in 2003 by Defendant, Tom Anderson, and Chris DeWolfe, the current CEO of MySpace.

10.     Due to MySpace's growing popularity, Defendant News Corp, seized the opportunity and purchased MySpace and its parent company, Intermix Media, Inc., for an estimated $580 million in 2005.

11.     News Corp is a worldwide media conglomerate having total assets as of June 30, 2008 of approximately $62 billion and total annual revenues of approximately $33 billion.

### MySpace's Ineffective Safety Measures

12.     There are no adequate security measures in place to ensure the safety of MySpace users despite the following public statement made by Defendants' chief security officer, Hemanshu Nigam.

> *"MySpace serves as an industry leader on Internet safety, and we take proactive measures to protect our members," Hemanshu Nigam, MySpace's chief security officer, said in a statement. "We provide users with a range of tools to enable a safer online experience."*

13.     Defendants have actual knowledge that MySpace's safety measures are utterly worthless, yet they rely on the public's perception that MySpace is safe to use in order to generate more advertising revenue via new memberships.

14.     Defendants have in the past, and continue to, act negligently in regard to the safety of their current members and potential new members.  Defendants fraudulently misrepresent member identity is established during the registration process by collecting personally identifiable information, or "PII".

15.     Specifically, the first paragraph of MySpace's Privacy Policy, states:

> *"MySpace, Inc. ("MySpace" or "we") operates MySpace.com.  This Privacy Policy describes MySpace's use and sharing of personally identifiable information ("PII –your full name, email address, mailing address, telephone number, or credit card number) that **Members** voluntarily provide to MySpace when they register (also known as "Registration PII").  The term "User" refers to a **Visitor** or a Member.  This Privacy Policy applies to the services offered by MySpace, including any MySpace-branded URL (the "MySpace Website"), the MySpace instant messaging service, the MySpace application developer service and other features (for example, music and video embedded players), MySpace mobile services, and any other features, content, or applications offered from time to time by MySpace in connection with the MySpace Website (collectively, the "MySpace Services").  The MySpace Services are hosted in the United States.*

16.     As a requirement to create an account on MySpace, a new member must acknowledge

that he or she read the statements referenced above; in addition to agreeing to the terms of use by

clicking an acknowledgment box.

17.     Plaintiff has personal knowledge and concrete evidence that clearly demonstrates

MySpace does not in fact require, or even provide sections to complete, for a person's full

mailing address, telephone number or credit card information during the entire registration

process.

18.     This means anyone, of any age, can create a profile knowing the Defendants do not verify

their personal information including the birthday information they supplied.

19.     Defendants' registration process is relied upon to be a crucial safety measure in

establishing the age and identity of its members.  Since the Defendants are not establishing the

true age or identity of any member, Plaintiff and the other millions of MySpace users are

subjected to various forms of harm that can arise from people creating accounts using inaccurate

personal information.

20.     For example, a male can represent that he is 18 when in fact he is 40 in an effort to

communicate with females in their teens.  A convicted sexual predator can assume a false name,

establish a profile, and communicate freely with children on MySpace.

21.     MySpace's own founder, Defendant Tom Anderson, provided inaccurate personal

information during the registration process.  According to an article entitled "Is Age Just a

Number" by Jessica Bennett, found in the November 5, 2007 issue of Newsweek magazine, Mr.

Anderson's birthday is November 8, 1970.  His information was obtained through public

documents including his voter registration, phone and utility applications.  Mr. Anderson created

his account using a birthday that falls in early October of 1975.  He will turn 38 on November 8,

2008. His profile shows that he just turned 33.

22.     Defendants have engaged in reckless, willful, and negligent acts because of their greed for money.   Defendants' primary concern is their profits, not the safety of their MySpace members.

### Overview of Plaintiff's Celebrity Guardian Angel Site

23.     On or about July 1, 2006, Plaintiff created a personal MySpace profile.  Plaintiff intended to use her account to socialize, meet new friends and reconnect with old ones.

24.     Plaintiff encountered, and befriended unknowingly, several celebrity imposters while searching for new friends to add.  After she had already added them to her profile, she realized it was not the real people she was communicating with.

25.     Plaintiff came up with the idea to have a MySpace site exclusively for verified celebrity profiles.  The new account was created on or about September 14, 2006.  The site was formerly located at: www.myspace.com/officialcelebritymyspace.

26.     Plaintiff called herself, and the new page, Celebrity Guardian Angel, ("CGA"). The profile served as a public safety awareness site, as well as a gateway to allow fans to connect with their favorite celebrities.

27.     Plaintiff established her own credible verification methods to prove identity.  The CGA quickly became known as the profile to go to in order to find legitimate celebrity profiles.

28.     Plaintiff's face and title had become recognized throughout MySpace due the site's growing popularity.  Some celebrities, or their authorized site administrators, including Heather Locklear, Val Kilmer, Michael Bay, Lily Mariye, Samuel L. Jackson and Claudia Lynx, placed the CGA profile in their Top Friends to show that they were registered on the CGA as proof of authenticity for their fans.

29.    The CGA received increased public exposure since MySpace members had viewed the celebrity profiles referenced above and clicked on Plaintiff's page when they saw it.

30.    Plaintiff updated her "Newly Added Profiles & Verification Methods Used" blog every time she added a new celebrity, which listed their name, occupation, URL (web address) and showed how they were verified.

31.    Plaintiff posted blogs describing her verification methods and examples and what the add requirements were to get on the site.

32.    She then expanded her site to include a blog listing of popular TV shows broadcast by major networks, including NBC, ABC, FOX, CBS, Showtime, HBO, BRAVO and The CW. Under each show's listing, she displayed which characters had MySpace accounts.

33.    Plaintiff had established a great rapport with celebrities and fans of her site. Plaintiff warned members about fake charity profiles endorsed by celebrity imposters and encouraged them to always conduct research on charities before sending money. Plaintiff also warned parents how a celebrity imposter could be a sexual predator. People trusted her and supported her efforts to make MySpace safer for everyone.

34.    Plaintiff devoted at least four hours a day to the CGA site and more on weekends.

## IV.

## FIRST CAUSE OF ACTION - NEGLIGENCE

35.    On December 5, 2006, Plaintiff was unable to log into the CGA account. After checking her email, Plaintiff learned that Defendants had deleted the account stating Plaintiff had violated the terms of use and the account could not be restored.

36.    At no time from September 14, 2006 to December 5, 2006 had Plaintiff violated the terms of use. Plaintiff completely abided the terms.

37.    Despite several complaints to MySpace's customer service department, Defendants did nothing. Plaintiff discovered at a later date the Defendants had the ability to restore it immediately, but chose to misrepresent that fact when they sent the email to Plaintiff stating her account could not be restored.

38.    In early February of 2007, Plaintiff received information that her site had been deleted due to a false complaint made to MySpace's customer service department by a celebrity imposter.

39.    The impersonator was pretending to be the well known actor Johnny Depp. By way of Plaintiff's assistant, Chris Noble, Plaintiff was provided with a copy of the original email complaint submitted to MySpace on 11/18/06 and MySpace's response to the imposter's complaint stating that Plaintiff's site had been deleted.

40.    In the complaint, the impersonator falsely accused Plaintiff of harassing and bullying him and requested Defendants to delete her site. No evidence of harassment or bullying was provided in the complaint, nor does Plaintiff recall ever having contact with the person whom submitted the complaint.

41.    It was not a customary practice of Plaintiff's to send repeated emails to celebrities or other members wanting to be added to her site. Her verification methods and add requirements were clearly stated in the blogs on her page.

42.    If any party was unable, or refused to verify to get on the site for privacy or any other reason, she simply didn't add them. It made no difference to Plaintiff either way.

43.    MySpace did in fact delete Plaintiff's CGA site on December 5, 2006 per the imposter's request. MySpace's reply email to the imposter on December 6, 2006 acknowledged that Plaintiff's site had been deleted and thanked him for reporting Plaintiff's profile.

44.    MySpace had a duty to protect Plaintiff when it was demanded by another party to directly cause actual or foreseeable harm to Plaintiff.

45.    Defendants were aware or should have been aware that deleting a member's site could cause the member to suffer mental anguish at the very least.  Plaintiff and other members invest considerable time, effort and sometimes money setting up their profiles and developing new friendships.  Plaintiff invested a minimum of 332 hours of her free time to the CGA site from September 14, 2006 – December 5, 2006 (83 days @ 4 hrs/day min.).

46.    Incidentally, it's highly probable the Defendants would suffer mental anguish if an entity such as the government would delete myspace.com.

47.    Plaintiff's CGA site was valuable to her in an emotional sense due to her new friendships and the enjoyment she received from helping people.  In a similar manner the Defendants' site is valuable to them financially.  If either site was abruptly taken from the Plaintiff or the Defendants, the same result of mental anguish would occur.

48.    Additionally, Defendants were aware or should have been aware of the possibility the impersonator was not the actor Johnny Depp filing the complaint.  Defendants had previous knowledge of the numerous celebrity imposters on their site.  Some of the imposter accounts had been deleted by the Defendants for violating the terms of use for identity theft.

49.    When the reasonable person standard is applied in this case, it clearly shows the Defendants' negligence.  A reasonable person having knowledge of the existence of celebrity imposters would have looked at the imposter's complaint, realized the complaint was against a celebrity verification site, and likely would have demanded proof of harassment or proof of true identity before causing harm to Plaintiff.

50.    A reasonable person may have thought the imposter's intention was to harm the Plaintiff

by getting the Defendants to delete her site.

51.    If it were not but for the Defendants deleting Plaintiff's site, the Plaintiff would not have sustained any harm.

52.    Defendants breached their duty to protect Plaintiff when they complied with the imposter's demand to harm Plaintiff. Also, had the Defendants not misrepresented they verify members the imposter should not have been on MySpace to begin with.

53.    MySpace's negligent actions were the proximate cause of Plaintiff's damages.

54.    Plaintiff immediately suffered mental anguish, loss of sleep and loss of reputation.

55.    When a member or anyone from the public outside of MySpace typed in www.myspace.com/officialcelebritymyspace, and/or a member ran a search on MySpace under Plaintiff's true name, Julie Riggs, or display name of Celebrity Guardian Angel, the following MySpace message appeared, *"Invalid Friend ID. This person's account was either cancelled or terminated due to a violation of terms."*

56.    Upon reading Defendants' statement, a person could only conclude the Plaintiff had violated MySpace's terms of use or she cancelled her account. Defendants' statements lead the public to believe the Plaintiff had done something that was inappropriate.

57.    If anyone viewed one of the several celebrity profiles that had Plaintiff's profile in their Top friends, it was noticeable that Plaintiff's page was missing. A blank space appeared in place of Plaintiff's profile.

58.    In addition to Plaintiff's mental anguish, loss of sleep and loss of reputation, Plaintiff also lost irreplaceable items in the form of comments left by celebrities on the CGA site. The comments were as equally valuable to the Plaintiff as signed autographs. These comments cannot be replaced and are forever lost.

59.    Plaintiff seeks unliquidated general damages in excess of $75,000, exclusive of interest and costs, against MySpace and News Corp for negligence.

**V.**

**SECOND CAUSE OF ACTION - GROSS NEGLIGENCE**

60.    Defendants have knowingly and purposely placed corporate greed over the health and safety of MySpace members.

61.    Defendants actively solicit and encourage new memberships on myspace.com.  Once they entice people to read about MySpace and what it has to offer, they willfully misrepresent material information in regard to establishing age and identity during the registration process.

62.    This information is relied upon to be truthful as a basis for deciding whether or not to use Defendants' site.

63.    Defendants publicly state MySpace is safe to use and safe guards have been put in place for users when they have actual knowledge their representations are false.  Yet, they continue to act with conscience indifference as to the safety of their members.

64.    Defendants are aware that fake accounts have been created and members have used inaccurate personal information to create profiles.

65.    Defendants are aware via lawsuits filed against them that children have been sexually assaulted when adults provided inaccurate personal information to create accounts.  Defendants are aware that 13 year old Megan Meiers committed suicide because of a fake 16 year old boy named Josh Evans she met on MySpace.

66.    Having complete knowledge of these events and numerous others, Defendants' failure to use even the slightest amount of care shows their reckless and willful disregard for the safety of others.

67.    Defendants' actions, along with their omissions to act, demonstrate a conscience indifference and utter disregard for the rights and safety of Plaintiff, MySpace members and the public at large.

68.    Defendants' gross negligence was the proximate cause of harm to Plaintiff due to their misrepresentations about MySpace being safe and members are verified.

69.    Unless this Court stops Defendants' gross negligence, it is highly foreseeable that more people will be harmed.

70.    Plaintiff seeks unliquidated general damages in excess of $75,000, exclusive of interest and costs, and punitive damages against MySpace and News Corp for their willful and wanton misconduct.

71.    Plaintiff requests additional relief for Defendants' gross negligence. Plaintiff wishes this Court to enforce Defendants' representations that they collect all of the personally identifiable information they state during the registration process to prove age and identity of members. Plaintiff feels this would greatly help make MySpace safer.

72.    Plaintiff also seeks relief by having this Court issue Defendants an order to delete every celebrity imposter profile from MySpace. This action will also make MySpace safer.

**VI.**

**THIRD CAUSE OF ACTION – BREACH OF CONTRACT**

72.    Plaintiff filed a Demand for Arbitration claiming Defendants' negligence on or about February 15, 2007. Plaintiff filed her demand with the American Arbitration Association with the appropriate case management center according to the arbitration clause in MySpace's terms of use shown below:

> "*If there is any dispute about or involving the MySpace Services, you agree that the dispute shall be governed by the laws of the State of California, USA, without regard to*

*conflict of law provisions and you agree to exclusive personal jurisdiction and venue in the state and federal courts of the United States located in the state of California, City of Los Angeles. Either MySpace.com or you may demand that any dispute between MySpace.com and you about or involving the MySpace Services must be settled by arbitration utilizing the dispute resolution procedures of the American Arbitration Association (AAA) in Los Angeles, California, USA, provided that the foregoing shall not prevent MySpace.com from seeking injunctive relief in a court of competent jurisdiction."*

73.    Defendants did not respond to Plaintiff's arbitration demand. Plaintiff received a letter from the American Arbitration Association on March 22, 2007 stating that MySpace did not respond and it would no longer hear any disputes involving MySpace. Fox Group Legal, Defendants' legal representation, received the same letter.

74.    Defendants acted in bad faith and engaged in unfair business practices pursuant to 73 Pa. C.S.A. § 201-1, et seq. when they drafted the contract with an arbitration clause then failed in their duty to comply with the contract terms. Defendants' non-performance of the contract caused Plaintiff to suffer further mental anguish. Furthermore, Defendants' breach of the contract caused Plaintiff financial loss in the amount of $10,378.00 due to their fraudulent conduct and actions referenced in the seventh cause of action – fraud.

75.    Plaintiff seeks unliquidated general damages in excess of $75,000, exclusive of interests and costs against MySpace and News Corp for breach of contract.


## VII.

### FOURTH CAUSE OF ACTION - FRAUD

76.    Plaintiff suffered financial loss in the amount of $10,378.00 and mental anguish when she relied on the Defendants' misrepresentations in the terms of use regarding dispute resolution. Plaintiff was aware Defendants' had an arbitration clause in place when she created her account

and agreed to those terms.

77.    Plaintiff filed her demand for arbitration without retaining an attorney which is common in arbitration proceedings.

78.    Plaintiff's initial out of pocket costs would been $375.00 for the filing fee if Defendants would have arbitrated the claim.  Instead, Defendants proved they had no intention of arbitrating with the Plaintiff by failing to respond to the arbitration demand.

79.    Plaintiff retained a California law firm to assist her in resolving her dispute with the Defendants.  The law firm required Plaintiff to submit an upfront $10,000.00 retainer before they agreed to represent her.

80.    Plaintiff's legal representation used up the retainer during the period from April through August of 2008 trying to resolve Plaintiff's dispute with Defendants.   Another bill was submitted to Plaintiff in the amount of $378.00 for their legal services after the retainer was gone.

81.    Plaintiff was forced to terminate her former legal representation on August 25, 2008 because it became too costly for her to continue.

82.    Not only did Defendants fail in their duty to arbitrate with Plaintiff, Defendants continued to misrepresent how they would handle future member disputes. The American Arbitration Association mailed Plaintiff and MySpace's legal representation, Fox Group Legal, a letter dated March 22, 2007.  This letter stated the following:

*Dear Parties:*

*As of this date we have not received the required submissions and fees from the business in this matter.  Accordingly, we must decline to administer this case.  Any payment submitted by a party is enclosed for that party.*

*Further, since the business has not complied with our request to adhere to our policy regarding consumer claims, we must decline to administer any other consumer disputes involving this business. We request that the business remove the AAA name from its arbitration clause so that there is no confusion to the public regarding our decision."*

83.    Defendants intentionally and purposefully left its arbitration clause in place until February 28, 2008 when they changed the terms of use. For almost a year, Defendants were misrepresenting to its members and the public how disputes were going to be resolved when they knew the AAA wasn't going to hear anymore cases involving MySpace.

84.    In addition to fraudulently misrepresenting the arbitration clause, Defendants have fraudulently misrepresented that members are verified during the registration process and MySpace is safe to use. Defendants have fraudulently enticed Plaintiff and other members into creating memberships to generate more advertising revenue for them.

85.    Plaintiff relied on these misrepresentations when she created her account.

86.    Defendants' representations are unfair, misleading and reckless to Plaintiff, the public, MySpace members, and all the other competing social networking sites such as Facebook, Friendster and YouTube to name a few.

87.    Plaintiff and other MySpace members may have chosen to join another social networking site rather then Defendants' if the Defendants been truthful in their representations. They don't verify anyone upon registration and in essence the site is not safe to use.

88.    For example Facebook, one of Defendants' top competitors, warns the public and its members in capital letters in the terms of use that it does not guarantee Facebook Pages are operated or created by the individual or entity that is the subject of the Facebook Page as shown below:

*FACEBOOK DOES NOT PRE-SCREEN OR APPROVE FACEBOOK PAGES, AND CANNOT GUARANTEE THAT A FACEBOOK PAGE WAS ACTUALLY CREATED AND IS BEING OPERATED BY THE INDIVIDUAL OR ENTITY THAT IS THE SUBJECT OF A FACEBOOK PAGE. NOR IS FACEBOOK RESPONSIBLE FOR THE CONTENT OF ANY FACEBOOK PAGE, OR ANY TRANSACTIONS ENTERED INTO OR OTHER ACTIONS TAKEN ON OR IN CONNECTION WITH ANY FACEBOOK PAGE, INCLUDING HOW THE OWNER OF THE FACEBOOK PAGE COLLECTS, HANDLES, USES / OR SHARES ANY PERSONAL INFORMATION IT MAY COLLECT FROM USERS (PLEASE REVIEW THE FACEBOOK PRIVACY POLICY IF YOU HAVE ANY QUESTIONS OR CONCERNS REGARDING THE USE OR SHARING OF YOUR PERSONAL INFORMATION). YOU SHOULD BE CAREFUL BEFORE PROVIDING ANY PERSONAL INFORMATION TO OR ENTERING INTO ANY TRANSACTION IN CONNECTION WITH A FACEBOOK PAGE.*

89.     Facebook's representations clearly state to the public and members upfront they may encounter imposters and people that have used inaccurate personal information to register. The risk of harm is presented, but this is not the case with Defendants' representations.

90.     Defendants' representations are relied upon in making a decision whether or not to use its service. Plaintiff sustained damages of mental anguish, loss of sleep and loss of reputation when a celebrity impersonator coerced Defendants into deleting her site. According to Defendants representations, this imposter should not have been able to create an account for the actor Johnny Depp, which would have prevented harm to Plaintiff.

91.     Defendants fraudulently encouraged Plaintiff to create an account knowing she could be harmed by their representations. Plaintiff relied on Defendants' representations that disputes would be resolved using arbitration. Plaintiff also relied on Defendants' representations that member identity was established during the registration process and she would be safe using the site.

92.     The Defendants' fraudulent misrepresentations and actions were the proximate cause of Plaintiff's mental and financial harm.

93.     Mr. Anderson is guilty of fraud by misrepresenting his age. Since Mr. Anderson

becomes a member's first friend after an account has been established, Plaintiff and all other past, current and future MySpace members have been deceived and mislead by Mr. Anderson's untruthful misrepresentation.

94.    Referring back to the Newsweek article in Paragraph 21, Page 5, Andrew Haynes of Seattle, age 25, had this to say when he found out about Mr. Anderson's age,

*"I've always taken MySpace with a grain of salt, but Tom was my first friend.  It's kind of messed up that he lied to me."*

94.    Members are deceived by Defendants' false representations before and shortly after they create an account.  Mr. Anderson would have no other reason to use a false birthday then to entice younger users to join MySpace by making him self appear five years younger.  Minor children are subjected to further risk then adults and MySpace's false representations have contributed to children being harmed by using the site.

95.    Defendants' willful and wanton conduct needs to stop before more members get hurt.

96.    Plaintiff seeks unliquidated general damages in excess of $75,000, exclusive of interest and costs, special damages in the amount of $10,378.00 and punitive damages against MySpace, News Corp and Mr. Anderson for fraud.

97.    Plaintiff seeks additional relief by having this Court order Mr. Anderson to abide by Defendants' Eligibility Section of the terms of use agreement below:

*"Use of and Membership in the MySpace Services is void where prohibited.  By using the MySpace Services, you represent and warrant that (a) all registration information you submit is truthful and accurate; (b) you will maintain the accuracy of such information...."*

98.    Mr. Anderson must change his profile to reflect his accurate birthday and age.

## VIII.

## **FIFTH CAUSE OF ACTION - BREACH OF IMPLIED CONTRACT**

99.    Plaintiff attempted to help Defendants with the celebrity poser problem on MySpace via

her former site in an effort to reduce and/or eliminate the harm to other members caused by the

imposters.  Plaintiff was still very angry over the CGA deletion, but wanted to try to approach

MySpace directly about another CGA site hoping it would bring back her reputation if MySpace

endorsed it this time.

100.    Although Plaintiff had not established the new CGA site yet, Plaintiff mailed a proposal

to MySpace via Federal Express on December 13, 2006 asking it to endorse the CGA as the

official celebrity site of MySpace, and Plaintiff as the administrator of the site.  Plaintiff

provided her educational degrees along with reasons why she thought it would benefit MySpace

and its users to have an official celebrity site.

101.    After submitting the first proposal to MySpace and not receiving an answer, Plaintiff

thought she may have better luck getting a response from News Corp.  Plaintiff realized the

CGA, or a celebrity site maintained by MySpace, could be a lucrative asset to Defendants as well

as a public safety site.

102.    Plaintiff was prohibited from accepting any money for advertising in the terms of use.

Plaintiff accordingly posted that registering on the CGA site was free of charge to avoid any

confusion.  Prior to Plaintiff's posting, several celebrities asked if there was a charge to register

and if they could advertise on the CGA site.

103.    Plaintiff would inform them the site was free and they could advertise free of charge by

posting comments to Plaintiff that the public could see about their upcoming movies, TV shows

and projects, but she could not post movie banners on the site since it could make it appear to Defendants she was accepting money for advertising.

104.    Plaintiff spent hundreds of hours of her free time administering the site, which included developing new ideas and verification methods, searching official celebrity websites outside of Myspace for links to MySpace profiles, communicating with celebrities or their authorized agents regarding verification, addressing email questions and concerns from the public, and spending her own money on a monthly subscription to www.imdbpro.com (approximately $13.00/mo.) where she was able to find contact information for celebrities' managers, agents and publicists.

105.    Plaintiff felt she was entitled to be compensated for her idea and hard work trying to help Defendants rather then maintaining the CGA for free as she had originally proposed a few weeks earlier.

106.    Plaintiff called News Corp on January 4, 2007 to speak with Ms. Genie Gavenchak about her idea for the celebrity site.  Plaintiff had previously found Ms. Gavenchak's name on New Corp's website while conducting research on News Corp's business.  Ms. Gavenchak holds the following title at News Corp:  Senior Vice President, Deputy General Counsel, Chief Compliance and Ethics Officer.  Plaintiff assumed she would be the person to talk too since her title involved legal and compliance matters.

107.    Plaintiff called News Corp's main telephone number (212) 852-7000 and asked for Ms. Gavenchak.  She was immediately transferred to her office.  Plaintiff spoke to Ms. Gavenchak's assistant, Kathy, for approximately 6.5 minutes according to Plaintiff's phone records.  Kathy asked Plaintiff to give her a summary of the proposal so she could relay the information to Ms. Gavenchak.  Kathy told Plaintiff either she or Ms. Gavenchak would return Plaintiff's call.

108.    Kathy did call Plaintiff back the next day (January 5th) at approximately 11:45 AM. Kathy said she had spoken to several attorneys there (at News Corp) and they were not interested in Plaintiff's site or her idea at that time.

109.    On or about February 27, 2007, Plaintiff created another CGA site identical to the first site. The new URL was www.myspace.com/jewlsakacga. The Celebrity Guardian Angel grew at a rapid rate again with a surge of increased profile views. Plaintiff had reconnected with some of the former celebrities on the site whom had placed the CGA profile back in their Top friends.

110.    Plaintiff had a friend of hers create a banner using HTML and Plaintiff's photos she provided that members could copy and place on their profiles to help Plaintiff advertise her site. Plaintiff designed the banner using the original CGA default picture of her face combined with a sunrise scene taken from her house to represent heaven and the angelic theme, and her title.

111.    The banner also scrolled her URL and the following phrases: "Verified Genuine Celebrity Profiles. A Safe Haven for the Stars."

112.    Celebrities and fans alike had Plaintiff's banner posted throughout MySpace on their profiles. All a person had to do was click the banner and it would link directly to Plaintiff's site.

113.    On or about November 5, 2007, Plaintiff again sent a proposal package via FED-EX to the President of News Corp, Peter Chernin and Ms. Gavenchak regarding the purchase of her site. The package also included a proposal written in the form of a blog about why MySpace should consider adding a fee to memberships. Plaintiff felt that adding a fee would help establish member identity by requiring members to provide credit card or bank information.

114.    On January 10, 2008, Defendant, Tom Anderson, announced the launch of MySpace Celebrity. The new site located at (celebrity.myspace.com) was advertised on the MySpace website and at least two press releases outside of MySpace. MySpace Celebrity was advertised

as Hollywood's new home page, the official celebrity channel, and allowed fans to interact with celebrities by proving one stop access to official celebrity MySpace profiles.

115.    Plaintiff immediately went to Defendants' new site and realized the Defendants stole her idea she had presented to them.  Defendants' celebrity directory on the new site listed the majority of the same celebrities registered on Plaintiff's CGA site.

116.    Defendants advertised MySpace Celebrity has already having more than 300 celebrity profiles when in fact it did not contain 300 profiles on the day of its launch.  At that time, Plaintiff's site did contain over 300 registered celebrities.

117.    Defendants copied the information for its celebrity directory from Plaintiff's page since Plaintiff had already done the verification work.

118.    Plaintiff decided to contact Brandon Beemer, (AKA the former Shawn Brady from the soap opera Days of Our Lives) to ask him if he was contacted by the Defendants to verify his account.  Mr. Beemer responded to Plaintiff's email stating he had no idea he was listed on Defendant's new page and was not contacted by Defendants.

119.    Plaintiff's claim for breach of implied in fact contract is very similar to the landmark case Desny v. Wilder 46 Cal.2d 216 (Cal. 1956) and the line of cases following it.

120.    Defendants caused Plaintiff significant monetary damages; although the exact amount is not known, and increased mental anguish by not compensating her for conveying the idea about a celebrity verification/promotional site to Defendants.

121.    Plaintiff's idea was original and novel in its concept.  MySpace did not have an official celebrity site that contained solely verified celebrity profiles which created a gateway, or channel, for members to interact with their favorite celebrities.

122.    Plaintiff presented the idea in writing to Defendants and verbally.  Plaintiff has proof in

the form of FED-EX receipts and phone records that Defendants received or heard about Plaintiff's idea.

123.    The Defendants did in fact misappropriate Plaintiff's idea on January 10, 2008 to unjustly enrich themselves and deter people from Plaintiff's CGA site where Plaintiff made members aware of the celebrity imposters on MySpace.

124.    At no time did Defendants disclose in their advertisements of MySpace Celebrity that celebrity imposters existed and people should be cautious.  Defendants only concern was their profits and the false perception that MySpace is safe

125.    Defendants had a legal duty to compensate Plaintiff.  Defendants have become unjustly enriched via advertising revenue by misappropriating Plaintiff's idea.

126.    Defendants breach of implied in fact contract was the proximate cause of Plaintiff's mental anguish and financial loss.

127.    Plaintiff seeks unliquidated general damages against MySpace and News Corp in excess of $75,000, exclusive of interest and costs, for her mental anguish and financial losses she suffered caused by the breach of implied in fact contract.

**IX.**

**SIXTH CAUSE OF ACTION - SECOND COUNT OF NEGLIGENCE**

128.    On or about February 5, 2008, Plaintiff received a very harassing email sent to the CGA site from the person whose account was registered as www.myspace.com/celebrityfanpages.

129.    Plaintiff filed a complaint for cyber bullying with Defendants' customer service department as she was supposed to do according to the terms of use and provided Defendants with a copy of the harassing party's email.

130.    Later that day, Plaintiff was unable to log into the CGA account.  Plaintiff checked her

email account and found another email from MySpace stating that her site had been deleted due to a violation of terms and her account could not be restored.

131.    Plaintiff had complied with Defendants' terms of use for reporting a complaint. Defendants were aware Plaintiff had suffered damages from the last deletion and were aware or should have been aware another deletion would compound her damages.

132.    At this point Plaintiff was literally seething with anger to the point that she was now consumed by it.

133.    Defendants had a duty to protect Plaintiff from suffering further harm they already knew existed.

134.    Defendants were aware Plaintiff had a history of being harassed by other members.

135.    Defendants had a duty to stop the harassment coming from the party at www.myspace.com/celebrityfanpages after receiving Plaintiff's complaint and proof of harassment from the site referenced above.

136.    Defendants breached their duty when they deleted Plaintiff's site for the second time and falsely accused Plaintiff again for violating its terms.

137.    Defendants did reactivate Plaintiff's account on February 7, 2008; however, the long term damage had already been done.

138.    Upon the CGA's restoration, Plaintiff received several emails from celebrities and supporters of site asking if she was trouble, why her site was deleted and why Defendants kept deleting her site.

139.    Some celebrities had deleted their profiles from her page after it was restored and she lost her Top friends placement on others.

140.    Defendants' negligent actions were the proximate cause of Plaintiff's mental anguish,

loss of sleep and loss of reputation.

141.    Plaintiff seeks unliquidated general damages in excess of $75,000 against MySpace and News Corp for negligence.

## X.

### SEVENTH CAUSE OF ACTION - FRAUD BY NON-DISCLOSURE

142.    Mr. Anderson conveys either by himself, or through the direction of MySpace and/or News Corp, important information to MySpace members via his MySpace profile located at: www.myspace.com/tom.

143.    Defendants were aware of Plaintiff's intent to pursue her legal claims against them with a trial by jury and had every right to do so.  Plaintiff notified the American Arbitration Association on February 26, 2008 that MySpace had not removed the AAA name from its arbitration clause.

144.    Plaintiff notified Defendants' former legal representation that she had contact the AAA that day.

145.    Plaintiff had unsuccessfully attempted to resolve her dispute with Defendants on her own for quite some time.  Defendants were aware Plaintiff had grounds for going to court since they had breach the arbitration clause.

146.    On March 1, 2008, Defendant, Tom Anderson, sent out an email stating the following, *"My lawyers tell me that I need to let every MySpace user know that MySpace's Terms of Use and Privacy Policy have been updated.  Feel free to take a look at them:*

**Terms of Use**

**Privacy Policy**

*Don't worry everyone received this message from me, and this doesn't mean we are charging. MySpace is still free!*

147.    Defendants purposely and deceitfully failed to disclose material information to Plaintiff regarding her legal rights by not sending the notification email to three of the CGA accounts, which included the public CGA, the private CGA site (non-accessible to the public) and the back-up site, which Plaintiff created the day of her second deletion.

148.    Several of Plaintiff's friends on MySpace were aware of her ongoing legal dispute with Defendants. They asked if Mr. Anderson's email and the terms change were because of her.

149.    Plaintiff asked all of her friends if they received Mr. Anderson's email and they had. Some of Plaintiff's friends had multiple accounts. Each of their accounts received the email.

150.    Only one of Plaintiff's four accounts received the email. Defendants had either forgotten about Plaintiff's personal account, or were unaware that it existed, and the email was sent to that account. Had Defendants not made that oversight, Plaintiff would not have known the terms were changed.

151.    Within the updated terms, Defendants changed the dispute jurisdiction to the courts of New York and members had to waive their rights to a trial by jury. The waiver of a trial by jury was a crucial issue of acceptance in the terms.

152.    MySpace back dated the updated terms of use and privacy policy to February 28, 2008. Defendants did this in an attempt to trick Plaintiff into accepting the new terms of use if she found out about the terms changing. Defendants' tried to cover all bases to deprive Plaintiff of her legal rights.

153.    If Plaintiff kept her accounts active after February 28, 2008, Defendants would try to argue Plaintiff's accounts were still active after the new terms were posted and she was subject to the new terms.

154.    MySpace's terms of use state that any updates take effect upon them being posted, yet

Defendants did not notify the members of the changes until March 1, 2008. Defendants intentionally did not allow time for any member to reject the new terms which greatly affected their legal rights, especially Plaintiff's. Note that Defendants had another day to notify members of the changes since February 29, 2008 is a leap year.

155.    Plaintiff realized what Defendants were trying to do to her on March 1, 2008. Plaintiff notified MySpace's legal representation on March 1, 2008 by email and phone that she was rejecting the new terms and cancelling all of her accounts that day. She also notified them that she was definitely going to court with a trial by jury.

156.    Defendants cancelled Plaintiff's private CGA site and the back-up site on March 1st. In an effort to antagonize the Plaintiff further, Defendants purposely did not cancel Plaintiff's public CGA account and her personal account within the stated 48 hour time MySpace gives to delete accounts.

157.    Defendants purposely did this in an attempt to get Plaintiff to log into her accounts. If Plaintiff logged in, she would be agreeing to the new terms.

158.    Defendants' fraudulent non-disclosure of the new terms email being sent to the public CGA account and other CGA accounts was the proximate cause of Plaintiff's mental anguish accompanied by purposely keeping her public sites active after she had cancelled them.

159.    Plaintiff seeks unliquidated general damages in excess of $75,000, exclusive of interests and costs, and punitive damages against MySpace, News Corp and Tom Anderson for their fraudulent non-disclosure.

## XI.

### EIGHTH CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

160.    Defendants were aware as early as February of 2007 that Plaintiff was suffering from mental anguish, loss of sleep, and loss of reputation via her demand for arbitration claim against them.

161.    Knowing this, Defendants purposely chose not to arbitrate Plaintiff's claim of negligence, purposefully and fraudulently enticed her to create an account through their misrepresentations, breached the implied in fact contract between them for their own profit, deleted her site CGA for a second time, intentionally tried to deprive Plaintiff of her legal rights by failing to notify her that the terms of use had changed, then kept two of her public accounts open after she had cancelled them.

162.    Defendants were in a position of power over the Plaintiff and used it against her. All but for the claims of negligence, Defendants' actions towards Plaintiff were intentional, malicious and meant to cause harm to Plaintiff.

163.    Plaintiff suffers from extreme emotional distress caused by Defendants' willful and reckless actions against her.

164.    Defendants were aware or should have been aware that each of its actions against the Plaintiff was likely to cause the Plaintiff to suffer mental anguish. Despite Defendants actual knowledge of Plaintiff's mental state, they intentionally continued to harm Plaintiff.

165.    Defendants' conduct is so extreme and outrageous in character that no person should have to be subjected to it.  Defendants' actions go beyond all possible bounds of decency and should not be tolerated in a civilized society.

166.     Plaintiff seeks unliquidated damages in excess of $75,000, exclusive of interests and costs and punitive damages against MySpace, News Corp and Tom Anderson for their intentional infliction of emotional distress on Plaintiff.

## XII.

## JURY DEMAND

167.     Pursuant to Rule 38 (b) of the Federal Rules of Civil Procedure, Plaintiff respectfully demands a trial by jury of all issues triable.

## XIII.

## REQUEST FOR RELIEF

Plaintiff requests that this court enter judgment against the Defendants as follows:

(a)     Unliquidated general damages in excess of $75,000, exclusive of interests and costs, exact amount to be determined at trial;

(b)     Punitive damages, the exact amount to be determined at trial;

(c)     Special damages in the amount of $10,378.00;

(d)     Reasonable and necessary attorney's fees, expenses and costs of suit as provided by law;

(e)     Pre and post judgment interest on all amounts awarded at the maximum interest rate provided by law;

(f)     Plaintiff wishes this Court to enforce Defendants' representations that they collect all of the personally identifiable information they state during the registration process to prove age and identity of members.  Plaintiff feels this would greatly help make MySpace safer.

(g)     Plaintiff wishes this Court to issue Defendants an order to delete every celebrity imposter profile from MySpace.  This action will also make MySpace safer.

(h)     Plaintiff wishes this court to order Mr. Anderson to change his MySpace profile to reflect

his accurate age and birthday; and

(i)      Any further relief in law and in equity to which Plaintiff may be justly entitled.


DATED:        October 23, 2008


Respectfully submitted,


Julie C. Riggs
1208 Bicyle Road
Stoystown, PA  15563
(814) 341-6998